## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER GUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 916 |
| v. | ) | |
| | ) | Magistrate Judge |
| P.O. McAULIFFE #1179; P.O. | ) | Maria Valdez |
| MORANDA #1159; and the | ) | |
| VILLAGE OF BOLINGBROOK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Gunn brought this complaint against the Village of
Bolingbrook and individual police officers McAuliffe and Moranda alleging wrongful
arrest in violation of 28 U.S.C. § 1983. A bench trial was conducted on August 25-
26, October 27, and November 30, 2021. The matter is now before the Court for
findings of fact and conclusions of law in accordance with Federal Rule of Civil
Procedure 52(a). The Court has considered the testimony of the witnesses who
testified at trial, the parties' admitted trial exhibits, any stipulations made by the
parties, the proposed findings of fact and conclusions of law submitted by the
parties, and the closing arguments and briefs of counsel. To the extent certain
findings of fact may be deemed conclusions of law, they should also be considered
conclusions of law. Similarly, to the extent matters contained in the conclusions of
law may be deemed findings of fact, they should also be considered findings of fact.

## FINDINGS OF FACT

1.      On March 1, 2017, Defendants McAuliffe and Moranda were on duty as police officers for the Village of Bolingbrook. During roll call at the start of their shift, they were told that there was an active arrest warrant for Plaintiff. (Ex. 1, McAuliffe Test. at 4-5, Moranda Test. at 132.)

2.      Both McAuliffe and Moranda were familiar with Plaintiff prior to March 1, 2017. (Ex. 1, McAuliffe Test. at 56; Ex. 1, Moranda Test. at 129-30.)

3.      In the early morning hours of March 2, 2017, Plaintiff was sitting in a vehicle in Bolingbrook with his friend Tia Parayor. (Ex. 2, Parayor Test. at 8.)

4.      Parayor had gone to the car earlier and sat in the passenger seat, awaiting a ride to the store from Sara Remy, the vehicle's owner and the mother of Plaintiff's children. (Ex. 2, Parayor Test. at 8, 36-39; Ex. 6, Remy Test. at 5, 51.)

5.      The car was parked a block over from the house where Remy was picking up her children. (Ex. 2, Parayor Test. at 38-39.)

6.      Plaintiff came out to the vehicle about ten or fifteen minutes after Parayor and sat in the driver's seat. (Ex. 2, Parayor Test. at 8, 42-43; Ex. 1, McAuliffe Test. at 56.)

7.      While on patrol at approximately 3:30 a.m. on March 2, 2017, McAuliffe observed a vehicle parked on Pepperwood Lane. (Ex. 1, McAuliffe Test. at 55.)

8.      A Village ordinance prohibited street parking between 2:00 a.m. and 6:00 a.m. (*Id.*; Ex. 6, Remy Test. at 35, 41.)

9.     When he was approximately 100 feet from the vehicle, McAuliffe illuminated it with his squad car's spotlight. As he drove closer toward the front of the parked car, McAuliffe observed two occupants in the vehicle, a female passenger, and Plaintiff, whom he recognized, in the driver's seat. (Ex. 1, McAuliffe Test. at 55-57.)

10.     McAuliffe believed at that time that there was an active arrest warrant for Plaintiff. He testified that after seeing Plaintiff in the vehicle, the purpose of the contact shifted to confirming the warrant. (Ex. 1, McAuliffe Test. at 22.)

11.     After he got out of his squad car and approached the vehicle, McAuliffe heard its engine running. (Ex. 1, McAuliffe Test. at 58-59.)

12.     The vehicle's driver's-side window was down as McAuliffe approached, but he did not know whether the driver rolled it down as he pulled up, or it was already down. (Ex. 1, McAuliffe Test. at 59.)

13.     The only way for the window to have been opened is if the keys were in the ignition. (Ex. 2, Parayor Test. at 40.)

14.     When McAuliffe approached the vehicle in which Plaintiff was sitting, he directed the occupants to keep their hands where McAuliffe could see them. (Ex. 1, McAuliffe Test. at 11, 22, 37, 60.)

15.     Parayor complied with the directive by raising her hands, but Plaintiff kept reaching around inside the vehicle and by his pant leg. (Ex. 1, McAuliffe Test. at 12-13, 60-62.)

16.     McAuliffe could not see what Plaintiff was reaching for. (Ex. 1, McAuliffe Test. at 12-13, 60-61.)

17.   McAuliffe testified that he smelled alcohol on Gunn's breath and burned cannabis from inside the vehicle. (Ex. 1, McAuliffe Test. at 60.)

18.   Plaintiff was argumentative, yelling to McAuliffe that he had taken care of the warrant and had paperwork for it. (Ex. 1, McAuliffe Test. at 12-13, 18, 61.)

19.   In the evening of March 1, Plaintiff had gone to Will County to turn himself in and post $5000 bond for that outstanding warrant. (Ex. 3, Gunn Test. at 7-9.)

20.   At some point, McAuliffe called for backup, and Officers Kendall and Moranda arrived on scene during his exchange with Plaintiff. (Ex. 1, McAuliffe Test. at 36-38, 62.)

21.   McAuliffe ultimately pulled Plaintiff from the vehicle by grabbing him through the open driver's side window with his left hand, while opening the door with his right hand. (Ex. 1, McAuliffe Test. at 62-63.)

22.   Approximately twenty seconds after McAuliffe got Plaintiff out of the vehicle, he put Plaintiff in handcuffs. (Ex. 1, McAuliffe Test. at 15-16, 19-20, 64; Ex. 1, Kendall Test. at 80.)

23.   McAuliffe testified that he had to apply tension and force Plaintiff into the handcuffs. (Ex. 1, McAuliffe Test. at 15-17, 64.)

24.   McAuliffe told Plaintiff he was being placed under arrest, and he later testified that Plaintiff was arrested for resisting his instructions at the beginning of their encounter, while being put into handcuffs, and during the pat-down. (Ex. 1, McAuliffe Test. at 16-21.)

4

25.    Moranda testified that he saw in the car a cup with a brownish liquid he believed to be consistent with Crown Royal, and several empty bottles of Crown Royal, but no cups or bottles were inventoried or photographed. (Ex. 1, Kendall Test. 85-86; Ex. 1, Moranda Test. at 157, 160.)

26.    No evidence of marijuana was collected from the vehicle. (Ex. 1, Kendall Test. 85-86; Ex. 1, Moranda Test. at 157, 160.)

27.    No officer questioned Parayor or Plaintiff about the presence of alcohol or marijuana in the vehicle on March 2, 2017. (Ex. 2, Parayor Test. at 12; Ex. 3, Gunn Test. at 26.)

28.    No officer asked Parayor about the vehicle's keys. (Ex. 2, Parayor Test. at 12.)

29.    Remy's vehicle was not towed on March 2, 2017 as a result of this incident. (Ex. 6, Remy Test. at 65.)

30.    After the arrest, Plaintiff was transported to the Bolingbrook police station and arrived there at approximately 3:57 a.m. (Ex. 1, McAuliffe Test. at 66; Ex. 7.)

31.    After Plaintiff arrived at the police station, Moranda began to perform a DUI investigation. (Ex. 1, Moranda Test. at 162-63; Ex. 7.)

32.    Moranda has had specialized training to detect impaired drivers and has been involved in approximately 1000 DUI investigations. (Ex. 1, Moranda Test. at 171-72, 181-82.)

33.    Moranda observed Plaintiff to have flaccid muscle tone, bloodshot and glassy eyes, and a strong odor of alcohol on his breath, and also that Plaintiff was behaving in a belligerent matter. (Ex. 1, Moranda Test. at 182.)

34.    Once Plaintiff was in the booking area, Moranda asked him to perform a field sobriety test. (Ex. 1, Moranda Test. at 178-79.)

35.    Plaintiff did not complete the test. (Ex. 1, Moranda Test. at 179.)

36.    Officer Andrew Sraga was on duty and on patrol on March 1 and 2, 2017. (Ex. 5, Sraga Test. at 4.)

37.    Sraga was a certified breath technician. (Ex. 5, Sraga Test. at 3-4.)

38.    Sraga was asked to go to the police station to perform a breathalyzer test, and he arrived at approximately 4:11 a.m. (Ex. 5, Sraga Test. at 4; Ex. 7.)

39.    Sraga was approximately seven feet away during his interactions with Plaintiff. (Ex. 5, Sraga Test. at 5-6; Ex. 7.)

40.    Sraga observed Plaintiff to have glassy, bloodshot eyes and a strong odor of alcohol on his breath. (Ex. 5, Sraga Test. at 5.)

41.    Sraga gave Plaintiff his glasses and read him the Illinois Warning to Motorist. (Ex. 5, Sraga Test. at 6-7; Ex. 7.)

42.    Sraga asked Plaintiff to perform a breath-alcohol test, but Plaintiff declined to do so. (Ex. 5, Sraga Test. at 7.)

43.    While he was at the scene of the arrest, Moranda observed Plaintiff seated in the driver's seat of a running vehicle. (Ex. 1, Moranda Test. at 182-83.)

44.    Moranda charged Plaintiff with DUI, stating that it was because Plaintiff was seated in the driver's seat of the vehicle; behaved erratically; was unable or unwilling to cooperate with his and McAuliffe's instructions; smelled of alcohol; and had glassy, bloodshot eyes and flaccid muscle tone. (Ex. 1, Moranda Test. at 182.)

45.    According to Remy, there were no bottles of alcohol or marijuana in her car on March 2, 2017. (Ex. 6, Remy Test. at 65-66.)

46.    Parayor testified that she did not observe any alcohol or marijuana in the vehicle on March 2, 2017. (Ex. 2, Parayor Test. at 8-9.)

47.    After a bench trial, Plaintiff was found not guilty of all criminal charges stemming from the incident. (Ex. 3, Gunn Test. at 36.)

48.    Plaintiff's driver's license was suspended as a result of the events on March 2, 2017. (Ex. 3, Gunn Test. at 31.)

49.    During this time period, Plaintiff had to take the train from Chicago to Bolingbrook to visit his children. (Ex. 3, Gunn Test. at 35.)

50.    Plaintiff's merchandise business suffered because of his suspended license. (Ex. 3, Gunn Test. at 32-34.)

51.    Plaintiff retained a criminal defense attorney, Cosmo Tedone, and paid $5000 for Tedone's representation in connection with the criminal charges stemming from the incident. (Ex. 3, Gunn Test. at 3.)

## CONCLUSIONS OF LAW

Plaintiff brought this action under 42 U.S.C. § 1983, alleging he was falsely arrested for disorderly conduct and driving under the influence, in violation of the Fourth Amendment. *See* 42 U.S.C. § 1983. Defendants contend there was probable cause for the arrest and that in the alternative, they are shielded from liability by qualified immunity.

"The existence of probable cause to arrest is an absolute defense to any §
1983 claim against a police officer for false arrest or false imprisonment." *Abbott v.*
*Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). There is probable cause "if the
totality of the facts and circumstances known to the officer at the time of the arrest
would warrant a reasonable, prudent person in believing that the arrestee had
committed, was committing, or was about to commit a crime." *Id.* This inquiry is
"purely objective," and "the officer's subjective state of mind and beliefs are
irrelevant." *Id.* The trier of fact must determine whether the facts and
circumstances at the time of the arrest, "viewed from the standpoint of an
objectively reasonable police officer, amount to probable cause." *Id.* (citations and
internal quotations omitted).

The probable cause determination does not require certainty that criminal
activity has taken place, only a probability or substantial chance. *Thayer v.*
*Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012); *see also Abbott*, 705 F.3d at 714
(citations omitted) ("[A]lthough it requires something more than a hunch, probable
cause does not require a finding that it was more likely than not that the arrestee
was engaged in criminal activity—the officer's belief that the arrestee was
committing a crime need only be reasonable.").

An evaluation of the probable cause determination necessarily depends on
the elements of the criminal statute at issue. *See Thayer*, 705 F.3d at 247. Officer
McAuliffe charged Plaintiff under 720 Ill. Comp. Stat. § 5/31-1(a), which provides
that "[a] person who knowingly resists or obstructs the performance by one known

to the person to be a peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor."

Plaintiff incorrectly argues that section 31-1(a) does not apply because McAuliffe was not undertaking an arrest at the time Plaintiff reached into his pocket for paperwork and/or Plaintiff's conduct did not include a physical act of resistance. "While older case law suggested that a 'physical act' was an element of the offense of obstruction of justice, the Illinois Supreme Court has clarified that a 'physical act' is not an essential element of the offense." *Baier v. Pikolcz*, No. 18-CV-05603, 2021 WL 3799597, at *5 (N.D. Ill. Aug. 26, 2021). Violations of the obstruction prong of the statute include "[p]assive acts that impede an officer's ability to perform his duties, such as repeatedly refusing an officer's order to exit a vehicle." *People v. Ostrowski*, 914 N.E.2d 558, 571 (Ill. App. Ct. 2009)); *see also Golatte v. City of Chi.*, No. 17 C 929, 2020 WL 4464675, at *5 (N.D. Ill. Aug. 3, 2020) (granting summary judgment on a false arrest claim, finding that the plaintiff's undisputed refusal to exit his vehicle hindered the police investigation, thus providing probable cause for his arrest under section 31-1(a)).

The Court concludes that based on the facts and circumstances known to McAuliffe at the time of the arrest, a reasonable officer would have found probable cause to arrest Plaintiff for impeding his duties, in violation of section 31-1(a). McAuliffe credibly testified that he repeatedly asked Plaintiff to keep his hands visible, yet Plaintiff did not immediately comply. Testimony offered on Plaintiff's behalf also supports the conclusion that Plaintiff did not follow McAuliffe's

instructions to show his hands. Parayor stated that after McAuliffe told them to put their hands up, he "kept telling [Plaintiff], 'Get out the car,'" and Plaintiff responded by telling the officer "that it was a misunderstanding, and I think he tried to hand him his ID." (Ex. 2, Parayor Test. at 10.) Plaintiff maintains that McAuliffe only told him once to keep his hands where the officer could see them, but he admitted that he then "[u]nconsciously" reached for his warrant paperwork. (Ex. 3, Gunn Test. at 88-89). Plaintiff appears to minimize the seriousness of this action, but "a suspect's refusal to make his hands visible or exit his vehicle create patent officer safety concerns, whereas the giving of a false name might not." *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 34; *see also Ray v. City of Chi.*, 629 F.3d 660, 663 (7th Cir. 2011) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)) ("Where a police officer 'has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'").

Furthermore, even assuming that "reasonable minds could differ" about whether Plaintiff was committing unlawful resistance or obstruction, then McAuliffe's actions are protected by qualified immunity. *See Roberson v. Liebermann*, No. 17 C 6156, 2019 WL 4855759, at *5 (N.D. Ill. Oct. 2, 2019). "Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Abbott*, 705 F.3d at 713 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Sometimes called "arguable" probable cause, qualified immunity "protects officers who reasonably but mistakenly believe that probable cause exists." *Id.* at 714-15, 718 (citation omitted) ("Qualified immunity protects police officers who reasonably interpret an unclear statute."); *see Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (citations and internal quotations omitted) (explaining that there is arguable probable cause "'when a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law").

In order to counter the qualified immunity defense, Plaintiff "must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713. Plaintiff contends that the law was clear at the time of his arrest that a short period of arguing and not complying with police orders does not constitute obstruction or resisting arrest. Plaintiff, however, did not merely argue with McAuliffe – he acknowledges that he reached into his pocket after the officer asked him to keep showing his hands. A reasonable officer in McAuliffe's position could readily have concluded Plaintiff was obstructing.

Plaintiff's claim of false arrest on the charge of driving under the influence fares no better. Plaintiff argues that the officers had no probable cause to arrest him for DUI because he was not in control of the vehicle, nor was he intoxicated.

Illinois law provides that "[a] person shall not drive or be in actual physical control of any vehicle . . . while under the influence of alcohol." 625 Ill. Comp. Stat § 5/11-501(a)(2). "A person need not drive to be in actual physical control of a vehicle, nor is the person's intent to put the car in motion relevant to the determination of actual physical control." *People v. Kiertowicz*, 2013 IL App (1st) 123271, ¶ 21. Whether a person is in actual physical control is a fact-based inquiry, and relevant factors include "whether defendant: (1) possessed the key to the ignition; (2) had the physical capability of operating the vehicle; (3) was positioned in the driver's seat; and (4) was alone in the vehicle with the doors locked." *Id.* (noting that "the list is neither exhaustive, nor is the absence of one individual factor controlling").

Plaintiff maintains that he was not in actual physical control of the vehicle because his and Parayor's testimony establishes that he was not holding the keys, they were not in the ignition, and the vehicle was not running. He further states that this fact is corroborated by the officers' failure to confiscate the keys or tow the vehicle, but rather allow it to remain in the possession of Parayor, who was not its registered owner. Plaintiff also finds it unlikely that the officers would have left Parayor, who was only twenty years old, in possession of the vehicle which allegedly contained alcohol and liquor containers.

The Court finds that the weight of evidence establishes that the keys were in the vehicle's ignition while Plaintiff was seated in the driver's seat, and therefore he had actual physical control. Gunn testified that the car was never running while he was in it; and Parayor claimed she had the car keys in her hand, Plaintiff never had

them, and the keys were never in the ignition. (Ex. 2, Parayor Test. at 8, 35-36, 43, 52-53; Ex. 3, Gunn Test. at 14, 24-25, 80.) However, their testimony is not credible based on the strong evidence that the window was lowered while they were sitting in the car.

Remy did not remember whether she left the driver's side window open when she parked earlier in the evening but stated that it most likely would have been closed or maybe cracked, and Parayor testified the window was open a crack when she got in. (Ex. 2, Parayor Test. at 40; Ex. 6, Remy Test. at 39-40.) Plaintiff was the only witness who testified it was already halfway open when he got into the vehicle. (Ex. 3, Gunn Test. at 16.) There is no dispute that by the time McAuliffe came to the driver's door, the window was open wide enough for him to hold onto Plaintiff through it. (Ex. 3, Gunn Test. at 20.) Finally, Plaintiff acknowledges that the driver's window could not have been lowered unless the keys were in the ignition. (Pl.'s Resp. to Defs.' Proposed Factual Findings ¶ 15) [Doc. No. 123] ("Ms. Parayor testified that the only way for someone to change the position of the windows would be to put the keys in the vehicle's ignition.").

Therefore, even if the Court were the disregard the officers' testimony that the vehicle was running, the credible testimony of Plaintiff's witnesses establishes that (1) the window was at best only slightly open before the material events of March 2; (2) by the time McAuliffe pulled Plaintiff out of the vehicle, the window was open wide enough for the officer to grab him through it; and (3) the window's position could not have changed unless the key was in the ignition. Therefore, the

13

only reasonable inference is that the keys were in the ignition at some point while Plaintiff was sitting in the driver's seat that night. With respect to the position of the window, Plaintiff responds only that the term "cracked" lacks a precise definition, and such a minor detail is subject to a margin of error in the witnesses' memories four years after the incident in question. Plaintiff's argument, however, disregards that it is his burden to establish the elements of his case by a preponderance of the evidence, and he has failed to do so here.

As with the section 31-1(a) charge, the officers' actions are also shielded from liability by the application of qualified immunity. Plaintiff was observed in the driver's seat of the vehicle and had the capability to drive. At various points in the night, not only McAuliffe and Moranda, but non-defendant Sraga smelled alcohol on Plaintiff's breath. Although he denies drinking alcohol that evening, the testimony he cites in support is unpersuasive.

Parayor testified that she did not see Plaintiff drink from the time he returned from Will County and went on to say that he does not drink at all due to his Muslim faith, and she has never seen him drink. (Ex. 2, Parayor Test. at 50-51.) However, Parayor's testimony is not wholly credible, as Plaintiff admitted to drinking beer with her earlier in 2021. (Ex. 3, Gunn Test. at 57-58, 102, 108.) Remy testified that she did not see Plaintiff drink or smoke marijuana after they returned from Will County, but she acknowledged that she did not know what happened after Plaintiff left the house to go to the car. (Ex. 6, Remy Test. at 54, 66.) Finally, Plaintiff said that although he is now an occasional drinker, he did not drink at all

14

in 2017. (Ex. 3, Gunn Test. at 102, 109.) Remy, however, testified that in 2017, he would occasionally drink. (Ex. 6, Remy Test. at 55.) In any event, Plaintiff admits he had glassy, bloodshot eyes the morning of March 2. (Pl.'s Resp. to Defs.' Proposed Factual Findings ¶ 35). Under the totality of the circumstances, a reasonable officer could have reasonably believed that probable cause existed to arrest Plaintiff for DUI.

Plaintiff responds that McAuliffe did not testify that he observed Plaintiff to be intoxicated or high, and the charge was manufactured at the station only after Plaintiff mouthed off at the officers. He contends that if the officers had reason to believe that Plaintiff was in control of the vehicle while intoxicated, or that there were alcohol containers in the car, then "there is no logical reason" for them to delay the start of their DUI investigation until after arriving at the station. Plaintiff, however, fails to offer any case law establishing that a person must be investigated for all potential charges at once, or that an investigation that seems illogical or poorly timed is constitutionally infirm.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants Village of Bolingbrook, P.O. McAuliffe #1179, and P.O. Moranda #1159 and against Plaintiff Christopher Gunn.

**SO ORDERED.**                                      **ENTERED:**

**DATE:**  <u>September 27, 2022</u>         _____
                                                     **HON. MARIA VALDEZ**
                                                     **United States Magistrate Judge**